UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

MICHAEL NEUDECKER,                         Case No. 07-CV-3506 (PJS/JJG)

Plaintiff,

v.

SHAKOPEE POLICE DEPARTMENT;                         ORDER
QUALITY LIFESTYLES, INC., d/b/a
Friendship Manor Health Care Center;
SCOTT COUNTY DEPARTMENT OF
HUMAN SERVICES; LAURIE McMILLEN;
CITY OF SHAKOPEE; and SCOTT
COUNTY,

Defendants.

---

Michael Neudecker, plaintiff pro se.

Jeffrey A. Egge and Jon K. Iverson, IVERSON REUVERS, LLC, for defendants City of
Shakopee and Shakopee Police Department.

Megan D. Hafner, TERHAAR, ARCHIBALD, PFEFFERLE & GRIEBEL, LLP, for
defendant Quality Lifestyles, Inc., d/b/a Friendship Manor Health Care Center.

James R. Andreen, ERSTAD & RIEMER, PA, for defendants Scott County, Scott County
Department of Human Services, and Laurie McMillen.

Plaintiff Michael Neudecker is not on the best of terms with his parents, James and

Gertrude Neudecker.[1]  James and Gertrude live in Friendship Manor Health Care Center, a

nursing home run by defendant Quality Lifestyles, Inc.  Friendship Manor is located in Shakopee,

a city in Scott County, Minnesota.

---

[1]To avoid confusion, the Court will refer to Michael Neudecker by his last name and to
James and Gertrude Neudecker by their first names.

-1-

In August 2005, the Shakopee Police Department cited Neudecker for disorderly conduct in connection with a vile letter that Neudecker sent to his parents. The charges were eventually dismissed. Neudecker contends that the citation was unlawful, and that all of the defendants played some role in the events leading up to the issuance of the citation. Neudecker brings this suit to recover damages for the injuries that he allegedly suffered as a result of being cited.

Defendants fall into three categories. The first category includes only one defendant, Quality Lifestyles, Inc. (whom the Court will refer to as "Friendship Manor"). The second category includes defendants Scott County, the Scott County Department of Human Services, and Laurie McMillen, an employee of the Scott County Department of Human Services (collectively, the "Scott County defendants"). The third category includes defendants the City of Shakopee and the Shakopee Police Department (collectively, the "Shakopee defendants").

Friendship Manor moves to dismiss the claims against it under Rule 12(b)(6) of the Federal Rules of Civil Procedure. In a Report and Recommendation ("R&R") dated November 27, 2007, Magistrate Judge Jeanne J. Graham recommended granting the motion [Docket No. 47]. In that R&R, Judge Graham also recommended denying a motion by Neudecker to amend his complaint.

The Scott County and Shakopee defendants have moved separately to dismiss the claims against them for failure to state a claim or for summary judgment.[2] Judge Graham recommended

---

[2]The City of Shakopee also asks the Court to find that Neudecker is a vexatious litigant and to enter an order barring him from filing any new lawsuits in this District without the prior authorization of a magistrate judge. Shakopee Defs. Resp. to Pl. Obj. to Mar. 25, 2008 R&R [Docket No. 69]. The Court declines to enter such an order at this time.

granting summary judgment to the Scott County and Shakopee defendants in a second R&R,

dated March 25, 2008 [Docket No. 66].

Neudecker objects to both R&Rs.  The Court has reviewed de novo those portions of the

R&Rs to which Neudecker objects, as required by 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b).

Although the Court agrees with Judge Graham that defendants' motions should be granted, the

Court's analysis differs somewhat from Judge Graham's.  The Court also finds that, under the

circumstances, Neudecker's motion to amend his complaint should be granted.  Accordingly, the

Court adopts the R&Rs only to the extent that they are consistent with this opinion.

## I.  BACKGROUND

In June 2005, Neudecker sued Friendship Manor and the City of Shakopee in Minnesota

state court.  Egge Aff. Ex. 1 [Docket No. 44].  According to the complaint, when Neudecker

telephoned his father, James, at Friendship Manor in May and June 2004, Neudecker's mother,

Gertrude, hung up on him.  Neudecker reported Gertrude's behavior to the staff at Friendship

Manor as well as to the Shakopee Police Department.  The Department declined to follow up on

Neudecker's complaints.  Egge Aff. Ex. 1 ¶ 6; Buetow Aff. ¶¶ 2, 6 [Docket No. 42].  Around the

same time, Gertrude complained to the Shakopee police about Neudecker's abusive phone calls.

Buetow Aff. ¶ 3.  Friendship Manor employees also complained to the Shakopee police that

Neudecker was verbally abusing his parents and Friendship Manor staff, one of whom requested

a police escort at the end of her shift because she feared Neudecker.  *Id.* ¶ 4; Egge Aff.

Ex. 1 ¶¶ 5-6, 9-10.

In his state-court complaint, Neudecker alleged that Friendship Manor violated his First

Amendment rights and other state-law rights by not following up on his complaints about

Gertrude hanging up on him.  Egge Aff. Ex. 1 ¶¶ 8.  Neudecker also alleged that police reports filed with respect to his behavior resulted from discrimination against him and unlawful reprisal by Friendship Manor and the City of Shakopee.  *Id.* ¶¶ 5, 9-10.  Neudecker's complaint was dismissed by the state trial court in November 2005.  Egge Aff. Ex. 2.

In early August 2005, Neudecker and his parents again came into conflict.  James told Friendship Manor staff that Neudecker had demanded money over the phone and had threatened to break James's bed apart if James did not pay up.  Salmela Aff. (Second) Ex. 1 [Docket No. 43].  Neudecker followed up his oral threats with a letter dated August 3.  Hafner Aff. Ex. 1-B [Docket No. 9].[3]  The letter read:

> James Neudecker:
>
> I want my cemet[e]ry plot money mailed to me by Fri. Aug. 12 or I will (1) sledg[e]hammer, hacksaw and sunder your medical bed and, (2) will have Yves move back in with me, but this time will have him sleep in Gertrude's bed in the master bedroom.
>
> He was probably fucked real good in his asshole in jail; so no doubt has AIDS and Hepatitis A, B & C.  I will therefore encourage him to jack off, jerk off a lot in Gertrude's bed and have his diseased wad[] splatter, spew onto the mattress box spring and floor, wall and doors.  This is because of Gertrude's obsessive crazy fear of germs/disease.

---

[3]In support of its motion to dismiss, Friendship Manor filed an affidavit of one of its attorneys, Megan D. Hafner.  Hafner Aff. [Docket No. 9].  Attached as exhibit 1 to Hafner's affidavit is an affidavit of Bruce Salmela that was filed in the state-court action that Neudecker filed in June 2004.  Salmela's state-court affidavit, in turn, has three exhibits, labeled exhibits A through C.  To avoid confusion with the two Salmela affidavits filed in *this* action, the Court refers to exhibits A through C to the Salmela affidavit filed in the *state-court* action as Exhibits 1-A through 1-C to the Hafner affidavit.

Please forward this to lawyer Berg as the coward you are
(having an attorney at your beck and call to beat up on your
disabled son) so that I can then turn this matter over to my attorney.

Much love,

Michael

*Id.*

Although the letter was directed to James, the letter was delivered to Friendship Manor in an envelope addressed to Gertrude.  Salmela Aff. (First) ¶ 5 [Docket No. 26]; Hafner Aff. Exs. 1-B, 1-C.  After she opened the letter, Gertrude showed it to Bruce Salmela, the administrator of Friendship Manor.  Salmela Aff. (First) ¶ 5.  Gertrude and James asked Salmela to "do something" about the letter.  *Id.* ¶ 6.

Salmela faxed a copy of the letter to the Scott County Human Services Department and asked whether Neudecker's letter qualified as a threat to a vulnerable adult.  Hafner Aff. Ex. 1-A.[4]   Defendant Laurie McMillen, a social worker employed by Scott County, received Salmela's fax and reviewed the letter.  McMillen Aff. ¶¶ 1-2 [Docket No. 35].  McMillen concluded that the letter "did not constitute maltreatment under the Vulnerable Adult Abuse Act" because it "did not specifically physically threaten" James.  *Id.* ¶ 3.  She nonetheless passed the letter along to detective Angela Trutnau of the Shakopee Police Department for further investigation.  *Id.* ¶ 4; Egge Aff. Ex. 4 at 2.

---

[4]Salmela says that he faxed the letter to the Shakopee Police Department.  Salmela Aff. (First) ¶ 7; Hafner Aff. Ex. 1 ¶ 3.  But it is apparent from the fax cover sheet, together with McMillen's affidavit and the relevant police report, that Salmela faxed the letter to McMillen, and McMillen then contacted the Shakopee Police Department.  *See* Hafner Aff. Ex. 1-A; Egge Aff. Ex. 4 at 2.

A Shakopee police officer (presumably Trutnau) followed up by visiting Friendship Manor.  Salmela Aff. (First) ¶ 7.  Trutnau then cited Neudecker on August 8, 2005 for disorderly conduct in violation of Minn. Stat. § 609.72.  Egge Aff. Exs. 4-5.  In a letter accompanying the summons and citation, Trutnau said that the summons was "being issued to you in reference to a letter that you sent to your parents at Friendship Manor in Shakopee."  Egge Aff. Ex. 5.

Neudecker pleaded not guilty to the charge on August 29, 2005, and the case was set for trial in Scott County on December 19, 2006.  On the day of trial, however, the prosecutor moved to dismiss the charges because the government was "experiencing certain witness issues," and the court granted the motion.  Egge Aff. Ex. 3 at 2:16-22.  Neudecker then brought this suit.

## II.  ANALYSIS

### A.  Neudecker's Motion to Amend

Neudecker moves to amend his complaint.  Mot. Leave Amend [Docket No. 20].  The proposed amended complaint provides more detail about his claims against Friendship Manor and separates the single malicious-prosecution claim in the original complaint into two separate malicious-prosecution claims, one under 42 U.S.C. § 1983 and the other under state law.

As a formal matter, Judge Graham recommended denying Neudecker's motion to amend his complaint as futile.  R&R Nov. 27, 2007 at 5.  As a practical matter, though, Judge Graham considered the allegations in both the original and amended complaints in addressing defendants' dispositive motions.  *Id.* at 3-5; R&R Mar. 25, 2008 at 8.  Moreover, the Shakopee defendants directed their arguments for dismissal or summary judgment to Neudecker's amended complaint.  Shakopee Defs. Mem. Supp. Mot Dism. and S.J. at 6, 8 ("Shakopee SJ Mem.") [Docket No. 41].

Under Rule 15(a)(2) of the Federal Rules of Civil Procedure, "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).  Neudecker's amended complaint is clearer than his original complaint; granting Neudecker's motion to amend would not prejudice any defendant; and both Judge Graham and the Shakopee defendants addressed the merits of the amended complaint.  Under these circumstances, the Court grants Neudecker's motion for leave to amend, and the Court treats the amended complaint attached to that motion as the operative complaint in this matter.

### B.  Standard of Review

### 1.  Friendship Manor's Motion to Dismiss

Friendship Manor moves under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Neudecker's complaint for failure to state a claim.  In evaluating such a motion, this Court must accept as true the complaint's factual allegations and then determine whether those allegations establish that the plaintiff is entitled to relief.  *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008).  The plaintiff must provide

> more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007).  At the same time, "detailed factual allegations" are not necessary to survive a motion to dismiss.  *Id.* at 1964; *see also Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008) ("*Bell Atlantic* must not be overread.").

2.  Shakopee and Scott County Defendants' Motions

The Shakopee defendants move to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56.  Shakopee Defs. Mot. Dism. at 1 [Docket No. 39].  The Scott County defendants apparently mean to do the same:  Although their motion is captioned "Motion for Summary Judgment" and mentions only Rule 56, the supporting memorandum says that they "bring a motion to dismiss, or in the alternative, a motion for summary judgment . . . ."  Scott County Defs. Mot. S.J. at 1 [Docket No. 32]; Scott County Defs. Mem. Supp. Mot. S.J. at 1 ("Scott County SJ Mem.") [Docket No. 34].

The Shakopee and Scott County defendants base their arguments largely on material outside of the complaint.  The Court therefore agrees with Judge Graham that their motions should be treated as motions for summary judgment.  *See* R&R Mar. 25, 2008 at 4.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party.  *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006).  In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party."  *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

*C.  Claims Against Friendship Manor*

Counts 1 through 3 of Neudecker's amended complaint assert federal claims under 42 U.S.C. § 1983 against all defendants.  Count 4 raises a state-law malicious-prosecution claim against all defendants.

Judge Graham recommended dismissal of Neudecker's state-law malicious-prosecution claim against Friendship Manor because his original and amended complaints "lack any indication that Friendship [Manor] had any role in the decision to prosecute."  R&R Nov. 27, 2007 at 5.  The Court agrees.  Neudecker alleges only that Salmela (Friendship Manor's administrator) reported Neudecker's behavior and provided Neudecker's letter to the Shakopee Police Department.  Amend. Compl. ¶¶ 6-7, 14, 17 [Docket No. 20].  This action by Salmela cannot support a malicious-prosecution claim.  *See Rohman v. N.Y. City Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000) (holding that "the mere reporting of a crime to police and giving testimony are insufficient" to support a malicious-prosecution claim) (citation omitted).  Further, Neudecker has not objected to this aspect of Judge Graham's R&R.  The Court therefore dismisses Count 4 with respect to Friendship Manor.

Judge Graham recommended dismissing the remaining three counts against Friendship Manor — all of which assert claims under 42 U.S.C. § 1983 — on the ground that Friendship Manor is not a state actor and therefore cannot be held liable under § 1983.  In objecting to Judge Graham's recommendation, Neudecker insists that Friendship Manor was indeed a state actor.  According to Neudecker, because Friendship Manor "not only undertook the public function of delivering mail to its residents, but also undertook responsibility for checking the content of mail to ensure compliance with laws regulating the use of the mail, its activities were sufficiently

entwined with state action to support a Section 1983 complaint."  Pl. Obj. to Nov. 27, 2007 R&R at 3-4 [Docket No. 51].  Neudecker further argues that Judge Graham wrongly relied on *Cooper v. United States Postal Service*, 482 F. Supp. 2d 278 (D. Conn. 2007), in finding that Friendship Manor was not a state actor.  Pl. Obj. to Nov. 27, 2007 R&R at 2-3.

Neudecker is correct that in *Cooper*, a nominally private company that operated a "contract postal unit" was held to be a state actor.  *See* 482 F. Supp. 2d at 292.  This holding rested on the so-called "entwinement" test:  *Cooper* held that the company was "*so entwined* with the Postal Service that [the company's] actions may be considered the actions of the Postal Service." *Id.* (emphasis added).  At the same time, *Cooper* held that the so-called "public function" test was *not* a basis for finding the company to be a state actor, because the Postal Service had not delegated an exclusively public function to the company.  *Id.* at 291-92; *see also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 302 (2001) (contrasting the entwinement and public-function theories).

Judge Graham construed Neudecker's complaint to assert that Friendship Manor was a state actor because it "performed a function that is traditionally reserved for the state."  R&R Nov. 27, 2007 at 3.  In other words, Judge Graham understood Neudecker to be relying solely on the public-function test.  Judge Graham construed *Cooper* as holding that "only 'the delivery and carrying of letters over postal routes' is reserved to the state." *Id.* at 4 (quoting *Cooper*, 484 F. Supp. 2d at 291).  Because Friendship Manor's alleged actions in handling Neudecker's letter did not involve delivering or carrying letters over postal routes, Judge Graham found that Friendship Manor was not a state actor under the public-function test.  *Id.*

-10-

Judge Graham did not, however, consider whether Friendship Manor might be deemed a state actor under the *entwinement* test. In objecting to the R&R, Neudecker appears to make two arguments: (1) that Judge Graham erred in finding that Friendship Manor was not a state actor under the public-function test; and (2) that even if Judge Graham correctly applied the public-function test, Friendship Manor should nevertheless be deemed a state actor under the entwinement test. Pl. Obj. to Nov. 27, 2007 R&R at 3-4.

The Court agrees with Judge Graham's ultimate conclusion that the facts alleged in the complaint, even if true, cannot support a finding that Friendship Manor was a state actor. As the Supreme Court held in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, an action of a nominally private entity may be treated as state action "if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." 531 U.S. at 295 (citation omitted). This general principle can lead to a finding of state action in various circumstances under either the public-function theory or the entwinement theory. But essential to a finding of state action under *any* theory is a "close nexus" between the state and the challenged private action. *Id.*

In this case, there is virtually no nexus — much less a close nexus — between Friendship Manor's activity with respect to Neudecker's letter and the United States Postal Service. Neudecker contends that Friendship Manor acted, in effect, as a postal inspector. But even if it did, Neudecker has not alleged that Friendship Manor acted at the instance of, or on behalf of, or with the approval of the Postal Service. The mere fact that Friendship Manor may have done something (inspecting mail) that is reserved by law to a government agency does not, without more, make Friendship Manor a state actor — any more than a husband becomes a state actor

when he inspects a letter addressed to his wife, or a mother becomes a state actor when she inspects a letter addressed to her son.  After all, vigilantes take upon themselves the exclusive state functions of determining guilt and imposing sentence — but this does not make them state actors.  Perhaps Friendship Manor was a postal vigilante, but Neudecker has not alleged any facts that would support a finding that Friendship Manor was a state actor.[5]  For that reason, the § 1983 claims against Friendship Manor found in Counts 1 through 3 of Neudecker's amended complaint are dismissed.

### D.  Claims Against Shakopee and Scott County Defendants

#### 1.  Count 1: § 1983 Claim for First Amendment Violations

In Count 1 of his amended complaint, Neudecker alleges generally that defendants violated his rights under the First Amendment.  Count 1 does not specify the basis of this particular claim.  It is apparent from the balance of the complaint, however, that only two possible expressive actions by Neudecker could underlie Count 1: (1) the lawsuit he filed against Friendship Manor and the City of Shakopee in June 2005, and (2) the letter he sent to Gertrude and James in August 2005.  And only one possible action by defendants could underlie Count 1: issuance of the disorderly-conduct citation in August 2005 (and the events leading up to it).

---

[5]In fact, the uncontroverted evidence demonstrates that Friendship Manor did *not* open Neudecker's letter, but simply delivered it to his mother, Gertrude.  Salmela Aff. (First) ¶ 5. Gertrude then opened the letter, and she and James showed it to Friendship Manor's staff, who forwarded the letter to the Scott County Department of Human Services.  *Id.* ¶ 7; Hafner Aff. Ex. 1-A; McMillen Aff. ¶¶ 1-2.  Based on this evidence, it is plain that Friendship Manor acted as Gertrude and James's agent with respect to their mail.  Thus, if Friendship Manor had moved for summary judgment with respect to Neudecker's § 1983 claims, rather than for dismissal for failure to state a claim, the Court would have granted summary judgment to Friendship Manor on the ground that it was not a state actor.

Count 2, however, asserts that defendants unlawfully retaliated against Neudecker for his June 2005 lawsuit against Friendship Manor and the City of Shakopee.  And Count 3 asserts that the August 2005 disorderly-conduct citation amounted to malicious prosecution.  In both Counts 2 and 3, Neudecker seeks relief under § 1983, as he does in Count 1.

Count 1 is therefore entirely duplicative of Counts 2 and 3.  In Counts 2 and 3, Neudecker seeks to recover under § 1983 for alleged violations of his First Amendment rights.  Neudecker has no separate, freestanding First Amendment claim apart from the claims raised in Counts 2 and 3.  Accordingly, the Court dismisses Count 1 as duplicative.

2.  Counts 2, 3, and 4 for Malicious or Retaliatory Prosecution

The heart of Neudecker's suit is his contention that his citation in August 2005 for disorderly conduct was legally unjustified and motivated by ill will.  Neudecker has fashioned three claims out of this contention: one under § 1983 for retaliatory prosecution based on Neudecker's June 2005 lawsuit against Friendship Manor and the City of Shakopee (Count 2); one under § 1983 for malicious prosecution based on his August 2005 letter to his parents (Count 3); and one for state-law malicious prosecution based on the same letter (Count 4).

Neudecker's two § 1983 claims depend upon his state-law claims.  That is, to succeed on his § 1983 claims, it will be necessary — though not sufficient — for Neudecker to succeed on his state-law claim for malicious prosecution.  If Neudecker cannot show that the prosecution was legally unjustified and motivated by ill-will — as he must to succeed on his state-law malicious-prosecution claim — then he cannot recover under § 1983.  The Court therefore first addresses Neudecker's state-law claim.

### *a.   Count 4: State-Law Malicious Prosecution*

To succeed on a malicious-prosecution claim under Minnesota law, a plaintiff must establish three things: (1) the defendant initiated a prosecution against the plaintiff without probable cause to believe the prosecution could succeed; (2) the defendant acted with malice; and (3) the prosecution terminated in the plaintiff's favor.  *Henry v. City of Minneapolis*, 512 F. Supp. 293, 295 (D. Minn. 1981); *Stead-Bowers v. Langley*, 636 N.W.2d 334, 338 (Minn. Ct. App. 2001).  In this case, there is no dispute that the prosecution of Neudecker terminated in his favor, but there are disputes over the elements of probable cause and malice.

Judge Graham concluded that probable cause supported Neudecker's prosecution for disorderly conduct and thus that his malicious-prosecution claim must fail.  R&R Mar. 25, 2008 at 6-7.  The Court agrees with Neudecker that Judge Graham's conclusion with respect to probable cause was mistaken.  There was, in fact, no chance that Neudecker could have been convicted of disorderly conduct.

As relevant to this case, Minnesota's disorderly-conduct statute, Minn. Stat. § 609.72 subd. 1, provides:

> Whoever does any of the following in a public or private place . . . knowing, or having reasonable grounds to know that it will, or will tend to, alarm, anger or disturb others or provoke an assault or breach of the peace, is guilty of disorderly conduct, which is a misdemeanor: . . .
>
> (3) Engages in offensive, obscene, abusive, boisterous, or noisy conduct or in offensive, obscene, or abusive language tending reasonably to arouse alarm, anger, or resentment in others.

Minn. Stat. § 609.72 subd. 1.

Section 609.72 is broadly written to cover both conduct and language.  Indeed, the statute purports to criminalize some uses of language that are constitutionally protected under the First Amendment (for instance, using "offensive . . . language tending reasonably to arouse . . . resentment in others").  To cure the statute's constitutional infirmities, the Minnesota Supreme Court gave it a limiting construction and "uph[e]ld its constitutionality by construing it narrowly to refer only to 'fighting words.'"  *In re Welfare of S.L.J.*, 263 N.W.2d 412, 419 (Minn. 1978). By the term "fighting words," the court meant "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction, or words which by their very utterance inflict injury or tend to incite an immediate breach of the peace."  *Id.* at 418 (citation omitted).  Neudecker's letter was grossly offensive, but it was not likely to provoke a violent reaction or incite an immediate breach of the peace.  In short, the letter did not contain fighting words, and thus Neudecker could not have been convicted of disorderly conduct for sending it.

There is a second reason why Neudecker's prosecution for disorderly conduct was not supported by probable cause.  In *State v. Thornblad*, the Minnesota Court of Appeals held, on facts very much like the facts of this case, that the trial court properly refused to instruct a jury on the crime of disorderly conduct.  No. C8-94-1701, 1995 WL 46205, 1995 Minn. App. LEXIS 158 (Minn. Ct. App. Feb. 7, 1995).  The defendant, Thornblad, had "mailed threatening letters directly to his victim."  1995 WL 46205 at *2.  The court held that because "Thornblad threatened only a single person, there is insufficient evidence to support a disorderly conduct conviction."  *Id.* at *1.

*Thornblad* relied on the advisory committee's comment to Minn. Stat. § 609.72.  *Id.*  The

advisory committee described the following "important qualification[]" specified in the statute:

> ["Others"] must be affected by the behavior.  It is not sufficient
> that a single person or, depending on circumstances, only a few
> have grounds to complain.  "Others" must be construed in the light
> of the objectives of the offense.  A family quarrel in a private home
> would not be sufficient although it may be in the presence of the
> children or of other relatives or of visitors also in the home.  But if
> passersby or neighbors were reasonably alarmed, angered or
> disturbed, the offense would be committed.

Minn. Stat. Ann. § 609.72, advisory comm. cmt. (1963) (West 2003).  Neudecker contends that if

"a family quarrel in a private home" cannot support a disorderly-conduct charge, surely a family

quarrel carried out by post cannot do so either.  Pl. Obj. to Mar. 25, 2008 R&R at 3.  The Court

agrees.  Under *Thornblad*, Neudecker could not have been convicted for disorderly conduct, even

if his letter had contained fighting words, because he sent the letter only to his parents.

Although Neudecker can establish that his citation for disorderly conduct was not

supported by probable cause, he must do more than that to recover on his malicious-prosecution

claim.  He must also establish that the Shakopee Police Department acted with malice in

charging him with disorderly conduct.  But a reasonable jury could not find that the Department

acted with malice, for the simple reason that the Department had probable cause to charge

Neudecker with a more-serious crime.

Neudecker was wrongly charged with the *misdemeanor* of disorderly conduct.  But he

could have been charged with the *gross misdemeanor* of harassment.  Specifically, Minn. Stat.

§ 609.749, subd. 2(a)(1) provides that "[a] person who harasses another by . . . directly or

indirectly manifest[ing] a purpose or intent to injure the person, property, or rights of another by

the commission of an unlawful act" is guilty of a gross misdemeanor.  Minn. Stat. § 609.749,

subd. 2(a)(1).  Neudecker threatened in his letter that, if his elderly father did not send him money, he would "sledg[e]hammer, hacksaw and sunder" his father's "medical bed."  Hafner Aff. Ex. 1-B.  Thus, the Shakopee Police Department had probable cause to charge Neudecker with "harass[ing]" his father by "manifest[ing] a purpose or intent" to injure his father's "property" by committing an unlawful act.  *See* Minn. Stat. § 609.749, subd. 2(a)(1). (Maliciously destroying the property of another is prohibited by both the civil and criminal law. *See, e.g.*, Minn. Stat. § 609.595, subd. 2.)  This is not to say that Neudecker would necessarily have been *convicted* of the charge, but the charge would have been supported by probable cause.

Defendants are thus entitled to summary judgment on Neudecker's state-law malicious-prosecution claim because no reasonable jury could conclude that defendants acted with malice in charging Neudecker with the lesser offense of disorderly conduct when defendants had probable cause to charge him with the more-serious offense of harassment.  Charging Neudecker with disorderly conduct was a mistake, but it was a mistake that *ran in his favor*.  It was also an understandable mistake, given that both the disorderly-conduct statute and the harassment statute criminalize certain kinds of threatening language.  In sum, where, as here, the government makes a legally unsupportable charge of disorderly conduct against a defendant rather than a legally supportable charge of harassment, the charge of disorderly conduct cannot support a malicious-prosecution claim, because mistakenly charging a defendant with the less-serious crime of disorderly conduct is inconsistent with a finding of malice on the government's part.

3.  Count 2: §1983 Claim for Retaliatory Prosecution

Even if Neudecker could prevail on his state-law claim for malicious prosecution, he would have to do more to recover on his § 1983 claims.  Malicious prosecution is actionable under §1983 only when the state-law offense is coupled with "a deprivation of constitutional magnitude."  *Henry*, 512 F. Supp. at 296 (citation omitted).  Generally, the particular constitutional deprivation associated with a malicious-prosecution claim under § 1983 is a deprivation of liberty.  *See id.*; *Rohman*, 215 F.3d at 215.  But a § 1983 malicious-prosecution claim may also be grounded on a First Amendment violation.  If the government prosecutes a defendant in retaliation for his exercise of his First Amendment rights, the defendant may seek redress under § 1983.  *See Jenkins v. County of Hennepin*, Civ. No. 06-3625, 2007 WL 2287840, at *6, 2007 U.S. Dist. LEXIS 56928 (D. Minn. Aug. 3, 2007).

To succeed on a §1983 claim of retaliatory prosecution for the exercise of First Amendment rights, a plaintiff must establish, among other things, that the defendant acted with retaliatory animus.  *Id.*  Such retaliatory animus is simply a particular type of the malice that must underlie any malicious-prosecution claim.

In Count 2 of the amended complaint, Neudecker alleges that defendants retaliated against him for having filed suit against them in state court in June 2005.  This claim fails with respect to the Scott County defendants because they were not named in Neudecker's June 2005 action, and thus Neudecker has alleged no facts that would support a finding of retaliatory animus on the part of the Scott County defendants.

Count 2 also fails against the Shakopee defendants because no reasonable jury could find that they acted with retaliatory animus.  As explained above, Neudecker's state-law malicious-

prosecution claim fails because no reasonable jury could find that any defendant acted with malice in charging Neudecker for disorderly conduct in August 2005.  It follows that no reasonable jury could find that the Shakopee defendants acted with the retaliatory animus necessary to support a § 1983 claim for retaliatory prosecution in violation of the First Amendment.

### 4.  Count 3: §1983 Claim for Malicious Prosecution

In Count 3, Neudecker asserts a claim for malicious prosecution under §1983.  Whether this claim rests on a claimed deprivation of liberty resulting from the August 2005 disorderly-conduct citation or on a claimed violation of Neudecker's First Amendment rights with respect to the letter he sent his parents, defendants are entitled to summary judgment.

First, for the reasons given above, no reasonable jury could find that any defendant acted with malice or retaliatory animus in charging Neudecker with disorderly conduct in August 2005.  Second, a First Amendment retaliation claim based on the August 2005 letter would necessarily fail because the letter was a threat — indeed, likely criminal harassment — and therefore was not protected speech.  *See Doe v. Pulaski County Special Sch. Dist.*, 303 F.3d 616, 622 (8th Cir. 2002).  Finally, defendants have a number of additional meritorious defenses, which the Court discusses briefly below.

### 5.  Miscellaneous Defenses

#### a.  Laurie McMillen

McMillen is an employee of the Scott County Department of Human Services.  The undisputed evidence shows that McMillen did only two things: (1) she forwarded Neudecker's letter, which she received from Salmela, to the Shakopee Police Department, and (2) she

provided some background information to the investigating police officer, Trutnau.  McMillen

Aff. ¶ 4; Egge Aff. Ex. 4 at 2 ("On 08-05-05 I [i.e., Trutnau] received a phone call from

[McMillen] . . . referenc[ing] a letter received by some residents at Friendship Manor Nursing

Home.  McMillen faxed me a copy of the letter that had been received and explai[ned the]

circumstances.").  These actions cannot support a claim of malicious or retaliatory prosecution

against McMillen.  *See Rohman*, 215 F.3d at 217.

### b.  Scott County and Shakopee Defendants

Neudecker has sued the Scott County Department of Human Services (an agency of Scott

County) and the Shakopee Police Department (an agency of the City of Shakopee).  Both

agencies contend that they are not subject to suit.  Shakopee SJ Mem. at 7; Scott County SJ

Mem. at 6-7.  Though it makes little difference (given that Scott County and the City of

Shakopee are defendants), the Court agrees.  *See* Fed. R. Civ. P. 17(b)(3) (state law determines

an entity's capacity to be sued); *In re Scott County Master Docket*, 672 F. Supp. 1152, 1163 n.1

(D. Minn. 1987) (holding that the Scott County Attorney's Office and Sheriff's Department "are

not legal entities subject to suit"); *Hyatt v. Anoka Police Dep't*, 700 N.W.2d 502, 505 (Minn. Ct.

App. 2005) (holding that under Minnesota law, "[w]hile a municipal corporation such as the city

has the authority to sue and be sued, its departments have not been given that specific authority").

More important, both Scott County and the City of Shakopee contend that they cannot be

liable under § 1983 because there is no evidence that Neudecker was injured on account of a

policy or custom.  Under *Monell v. Department of Social Services*, government entities cannot be

held liable for constitutional violations committed by government employees unless some

government policy or custom caused the violations.  436 U.S. 658, 694 (1978) ("[A] local

-20-

government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."); *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir. 2008) (applying *Monell*).  The Court agrees with Scott County and the City of Shakopee that Neudecker has not alleged, let alone proved, the existence of any such policy or custom, and therefore they are entitled to summary judgment under *Monell* with respect to both Counts 2 and 3.

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, the Court SUSTAINS IN PART and OVERRULES IN PART the objections of plaintiff Michael Neudecker to Magistrate Judge Jeanne J. Graham's November 27, 2007 Report and Recommendation [Docket No. 47] and to Judge Graham's March 25, 2008 Report and Recommendation [Docket No. 66].  The Court ADOPTS IN PART both Report and Recommendations to the extent that they are consistent with this Order.  Accordingly, IT IS HEREBY ORDERED THAT:

1.      The motion of plaintiff Michael Neudecker to amend his complaint [Docket No. 20] is GRANTED.

2.      The motion of defendant Quality Lifestyles, Inc., d/b/a/ Friendship Manor Health Care Center, to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) [Docket No. 7] is GRANTED.

3.      The motion of defendants Scott County, Scott County Department of Human

Services, and Laurie McMillen for summary judgment [Docket No. 32] is

GRANTED.

4.      The motion of defendants City of Shakopee and Shakopee Police Department to

dismiss or for summary judgment [Docket No. 39] is GRANTED.

5.      Plaintiff's amended complaint is DISMISSED WITH PREJUDICE AND ON

THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  September 3, 2008                    s/Patrick J. Schiltz
                                             Patrick J. Schiltz
                                             United States District Judge